EMN:DR:SDD
F.#2012R01387

**12 M 829**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

MING SUAN ZHANG,

               Defendant.

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT OF
ARREST WARRANT

(T. 50, U.S.C., §§
1705(a) and 1705(c); T.
15, C.F.R., § 764.2)

- - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

     ROBERT DUGAN, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Commerce ("DOC"), duly appointed according to law and acting as such.

     Upon information and belief, in or about and between July 18, 2012 and September 6, 2012, within the Eastern District of New York and elsewhere, the defendant MING SUAN ZHANG, together with others, did knowingly, intentionally and willfully attempt to export from the United States to China items under the jurisdiction of the United States Department of Commerce, to wit: one or more spools of Toray type M60JB-3000-50B carbon fiber, without first having obtained the required licenses from the United States Department of Commerce.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 15, Code of Federal Regulations, Section 764.2).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with DOC since August 2003. I am currently assigned to the Special-Agent-in-Charge Field Office, in New York. My duties include the investigation and prosecution of violations pertaining to the export of licensable commodities, such as high technology items that have military and aerospace applications. As a Special Agent with DOC, I have participated in numerous investigations into violations of the United States export control laws, during the course of which I have conducted or participated in surveillance, execution of search warrants, debriefings of informants, and review of documents and recorded conversations.

---

[1] The information contained in this affidavit is based upon my conversations with various law enforcement agents, and others, as well as my review of, among other things, reports, personal observations and recordings. Where statements of others are related herein, they are related in sum and substance and in part. Where foreign language materials are set forth, they are set forth based on summary and/or draft translations. Because the purpose of this affidavit is merely to establish probable cause to arrest the defendant, I have not set forth all of the facts and circumstances of which I am aware.

I.   Applicable Export Regulations

2.   The export of so-called "commerce controlled" items is regulated by the DOC.  Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 et seq., the President of the United States was granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States.  Under IEEPA, the President could declare a national emergency through Executive Orders that had the full force and effect of law.

3.   On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies and extended the Export Administration Regulations (the "EAR"), 15 C.F.R. §§ 730-774.  Through the EAR, the DOC imposed license or other requirements before an item subject to the EAR could be lawfully exported from the United States or lawfully re-exported from another country.  These items are listed on the commerce control list, or "CCL," published at 15 C.F.R. § 774.  The President issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the time of this affidavit.  See 77 Fed. Reg. 49,699 (Aug. 16, 2012).

4. Pursuant to its authority derived from IEEPA, the DOC reviews and controls the export of certain goods and technology from the United States to foreign countries. In particular, the DOC has placed restrictions on the export of goods and technology that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under IEEPA and the EAR, it is a crime to, among other things, willfully export, conspire to export, attempt to export or aid and abet the export from the United States any item subject to the EAR for which a license is required without first obtaining the license from the DOC. 50 U.S.C. §§ 1705(a) and 1705(c); 15 C.F.R. § 764.2.

II. The Investigation

5. DOC, along with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), is conducting an investigation into the activities of the defendant MING SUAN ZHANG and others for attempting to export commerce controlled items from the United States to China, among other countries, without possessing the requisite export license.

6. Among its investigative tools, HSI administers a website that purports to be for a company (the "Company") that deals in high-technology commodities, including commodities with

5

aerospace and military applications. The website has a feature that allows visitors to the site to submit an online request for information via email.

7. On or about April 25, 2012, two individuals located in Taiwan, referred to herein as JOHN DOE and JANE DOE (together, "the Buyers"), contacted an undercover HSI agent ("UC") via teleconference to negotiate the acquisition of multiple tons of carbon fiber. During the call, which was recorded, the UC specifically informed JANE DOE of the fact that a license was required to export the type of carbon fiber requested from the United States. The Buyers then conferred with each other in Mandarin. The Buyers discussed the fact that obtaining a license would be problematic, because the acquisition related to a "military matter," and was therefore sensitive.

8. The Buyers then asked the UC whether he could ship the carbon fiber to a third country that did not require an export license. When the UC declined this proposal, JANE DOE then asked whether the carbon fiber could be purposefully mislabeled. The UC indicated that to do so would be illegal.

9. The UC and JANE DOE continued to discuss possible methods of obtaining multiple tons of carbon fiber absent a license. JANE DOE then requested a "trial order" of three cases of carbon fiber, including one case of type M60JB-3000-50B.

10. Following the April 25, 2012 teleconference, the Buyers pursued a meeting in the United States, as soon as could be arranged, in order to acquire a sample. On or about May 7, 2012, JANE DOE sent an email to the UC suggesting that she and JOHN DOE should pay for the commodity in cash:

> Again, money is not the problem . . . A friend of [JOHN DOE's] suggested him to pay money by cash when meeting in [the United States]. If u don't agree, then remit to your priviate [sic] account is also another way. All are to avoid both government's unnecessary investigation, if "unluckily." What's your opinion? In my personal opinion, pay cash when meeting in [the United States] is best and safe way.

After the UC stated that he preferred a wire transfer, on or about May 8, 2012, JANE DOE wired $1,000 to a United States bank account provided by the UC, as a deposit.

11. On or about July 5, 2012, the Buyers traveled from Taiwan to the United States to meet with the UC for the purpose of negotiating a multi-million dollar deal for the export of carbon fiber.

12. On or about July 6, 2012, the Buyers met with the UC in a hotel room in the United States to discuss pricing and possible shipping options. At the conclusion of the meeting, the UC provided the Buyers with a sample of carbon fiber, which included one spool that was represented to the Buyers to be Toray type M60JB-3000-50B carbon fiber.

13. On or about July 17, 2012, JOHN DOE received an email from a Chinese email account relating to the acquisition of type "M60" carbon fiber. The author of the email stated that he had found an end user for the carbon fiber, and that it was needed for the test flight of a new Chinese fighter jet.

14. In the course of this investigation, I have obtained a copy of what appears to be JOHN DOE's contact list. On the list, there is a Chinese telephone number next to the name of the defendant MING SUAN ZHANG. On or about July 18, 2012, while within the Eastern District of New York, JOHN DOE placed a call to that telephone number. I have reviewed a transcript of a recording of the ensuing conversation, a portion of which is excerpted below:

> JOHN DOE: You were looking for me right?
>
> ZHANG: Right, looking . . . I got a heartache from waiting for you.
>
> JOHN DOE: Really? Uh, sorry.
>
> ZHANG: What's the deal? What's the deal? What's the situation? No, don't say that . . . no need to be so polite between you and me.
>
> JOHN DOE: I, I, let me tell you . . . I . . . I went to Japan huh . . . That . . . They weren't able to give it to me. They wanted me to go through the regular process in order for it to exit. So, so it won't work. That's why right now I . . . They introduce me a . . . that . . . in the United States, New York, a seller. Huh. In fact, I have seen the merchandise.
>
> ZHANG: Hmm.

JOHN DOE: Eh, then . . . In fact, I have seen the merchandise. If the merchandise has to be exported from the United States . . . export the merchandise, it'll need . . . to apply for the export permit/license with the United States government. Then, [we'll] also need to explain to the United States government how the merchandise will be used.

ZHANG: Then it is equivalent to nothing.

JOHN DOE: Equivalent to . . . do you mean that you're unable to do it when you said it's equivalent to nothing?

ZHANG: Eh, eh, it is impossible . . . You won't be able to get it if you apply. Also the application would not be approved without [UI]

JOHN DOE: Eh.

ZHANG: I, right now, let me tell you, right now what we need to do: we need to get a sample to give to the other people. And let them say that . . . other items don't really matter if [we] don't do it. Otherwise . . .

JOHN DOE: Let me tell you. Let me tell you. Right now he said . . . if . . . that . . . the merchandise can't be exported . . . If it can't [go through] the regular [process]. . . if it can't [go through] the regular [process] from your side to export the merchandise, then the cost of it will increase. Also, this method . . . The seller told me that [by conducting] this method in the United States would violate the law, and [you will] go to jail. There are a lot of risks. That's why the fee has to increase.

ZHANG: The fee has to increase. That means the price has to go up. That means it can't be done. So what's the point of it, right?

JOHN DOE: Hmm.

ZHANG: Are you now in Taiwan or Japan?

JOHN DOE: I, right now I am in the United States.

> ZHANG: In the United States, then can you bring one sample piece/bobbin back? One piece/bobbin will do.
>
> JOHN DOE: Hmm. He . . . Then right now do you still want me to help you . . . ?
>
> ZHANG: What made you think I don't want it? I . . . I . . . I can tell you for sure that you can keep the pound sign on the top. I'm telling you that I have found the opportunity, the person in charge of 60, M60, you know? . . .
>
> JOHN DOE: Hmm.
>
> ZHANG: I have [UI] that . . . this matter has troubled me for a couple of months. Other people, the, the one from Beijing will not come back because he does not trust me anymore. You know.

Later in the conversation, the defendant added, "When I place the order, I [UI] place one to two tons. However, the first shipment will be for 100 kg." JOHN DOE and the defendant also discussed funding for the deal.

15. Subsequently, another undercover HSI agent, purporting to be the U.S.-based seller of carbon fiber ("UC2"), emailed the defendant MING SUAN ZHANG to discuss the possibility of a face to face meeting regarding the proposed transaction. For example, on August 9, 2012, UC2 sent an email to the defendant, in which UC2 stated that he understood that the defendant preferred that he travel to China, but that UC2 would rather meet in the United States. UC2 further informed the defendant that, at that meeting, they would discuss a way to ship the carbon fiber to China, noting "I can't ship them directly

from Brooklyn to China because you are unable to provide export license. . . . It is against the law to ship out to China without an export license."

16. On or about August 29, 2012, the defendant MING SUAN ZHANG sent UC2 an email indicating that he planned to travel to the United States on September 10, 2012, and provided the name of his hotel. In addition, the defendant specifically requested that UC2 arrange to provide samples of "M60JB-3000-50B," and inquired as to the quantity that UC2 could provide on a monthly basis.

17. On August 30, 2012, the defendant MING SUAN ZHANG informed UC2 that his customer needed a sample of the carbon fiber because it would be used for a test flight of a "fighter plane" on October 5, 2012. Later that day, the defendant confirmed his itinerary for travel to the United States during the week of September 10, 2012.

18. On September 6, 2012, an HSI undercover agent shipped two spools of carbon fiber, labeled M60JB-3000-50B, from Brooklyn, New York to the meeting location in anticipation of the meeting with the defendant.

III. Potential Uses of High Grade Carbon Fiber

20. Agents have spoken to representatives of Toray, the manufacturer of the specific type of carbon fiber the defendant sought to acquire, and also have conducted additional

research about the uses of the product. Based on this information, I know that carbon fiber is a commodity, subject to U.S. government license regulations, which has both military and non military uses. Carbon fiber composites are ideally suited to applications where strength, stiffness, lower weight, and outstanding fatigue characteristics are critical requirements. These composites also can be used in applications where high temperature, chemical inertness and high damping are important.

21. The two main applications of carbon fiber are in specialized technology, which includes aerospace and nuclear engineering, and in general engineering and transportation, which includes engineering components such as bearings, gears, cams, fan blades and automobile bodies. In addition, certain carbon fiber based composites are used in military aircraft. According to Toray, type M60JB-3000-50B carbon fiber is an extremely high-grade product, and is used primarily in aerospace and military applications.

22. Due to the cost of aerospace-grade carbon fiber composites, they are not well-suited to conventional applications. For example, M60JB-3000-50B carbon fiber costs approximately $2,204 per kilogram. One ton of M60JB would typically cost approximately $2,000,000.

12

IV. License Determination

23. The DOC has determined that the Toray type M60JB-3000-50B carbon fiber requested by the defendant is under the licensing jurisdiction of the DOC and would require a license for export to China. The DOC has advised, however, that no licenses have been obtained by any party involved in the proposed export transaction. The DOC has further determined that Toray type M60JB-3000-50B carbon fiber is classified under Export Control Classification Number 1C210.a, for nuclear non-proliferation and anti-terrorism reasons.

WHEREFORE, because the defendant MING SUAN ZHANG took a substantial step towards committing the crime of unlicensed export of a commodity controlled by the DOC, your deponent respectfully requests that an arrest warrant issue for the defendant MING SUAN ZHANG so that he may be dealt with according to law. Due to the risk of flight of the defendant and/or the destruction of evidence, I further request that the arrest warrant and this affidavit be issued under seal, and that they be unsealed only for the purpose of providing a copy to the

defendant and his counsel at the time of the defendant's initial appearance, and shall otherwise remain under seal until further order of the Court.

_____
ROBERT DUGAN
Special Agent
U.S. Department of Commerce

Sworn to before me this
7th day of September, 2012

_____
HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK